IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|                                              |     |                          |
| -------------------------------------------- | --- | ------------------------ |
| JOHN REYES MATAMOROS,                        | §   |                          |
|                                              | §   |                          |
|                                              | §   |                          |
| Petitioner,                                  | §   |                          |
|                                              | §   |                          |
| v.                                           | §   | CIVIL ACTION H-07-2613   |
|                                              | §   |                          |
| RICK THALER, Director,                       | §   |                          |
| Texas Department of Criminal                 | §   |                          |
| Justice-Institutional Division,              | §   |                          |
|                                              | §   |                          |
| Respondent.                                  | §   |                          |
|                                              | §   |                          |

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on Petitioner John Reyes Matamoros's Petition for Writ of Habeas Corpus, and Respondent Rick Thaler's Motion for Summary Judgment. Having carefully considered the Petition, the Summary Judgment Motion, the evidence, and the arguments and authorities submitted by counsel, the Court is of the opinion that Respondent's Motion for Summary Judgment should be GRANTED, and Matamoros's's Petition for Writ of Habeas Corpus should be DENIED.

I.        Background

Petitioner John Reyes Matamoros, currently in the custody of the Texas Department of Criminal Justice ("TDCJ"), filed this federal habeas corpus application pursuant to 28 U.S.C. § 2254. A brief history of the case is appropriate.[1]

_____

[1]        For the sake of convenience, the key facts surrounding the case are adopted largely from the opinion of the Texas Court of Criminal Appeals ("TCCA") affirming Matamoros's

Matamoros and Eddie Goebel were neighbors. On the evening of July 18, 1990, as Goebel was approaching his home, Matamoros yelled at Goebel from a nearby balcony, saying that he wanted money Goebel allegedly owed him, "or else." Goebel went into his house without responding.

The next morning, after the time at which Goebel normally went to work, a neighbor noticed that Goebel's truck was still parked in front of his house. Seeing that the truck was still there at noon, and thinking that something might have happened to Goebel, she knocked on his bedroom window. No one replied.

At six p.m. on the same day, the police received a call from Larry Matamoros, John Matamoros's younger brother, reporting a homicide. On the basis of the call, police went to Goebel's house. They found the front door locked and the back door open.

Upon entering the home, police discovered bloodstains on the floor and found Goebel dead in his bed. Blood splattered on the walls indicated that Goebel was in bed at the time he was killed. He had twenty stab wounds and five cutting wounds, one of which was a five inch cut under his neck. He also had defensive wounds. The extent of Goebel's injuries indicated that he could not have walked around the house after being injured. Goebel was wearing only briefs and an undershirt and, although he always wore his glasses, they were found on the nightstand next to the bed. Goebel's wallet and keys were found on the dresser across the room and he was not wearing his watch. Although Goebel could not speak intelligibly without his false teeth, he was not wearing

---

conviction and sentence. *See Matamoros v. State*, 901 S.W.2d 470 (Tex.Crim.App. 1995). Where this opinion diverges from, or expands upon, the TCCA's recitation of the facts, it will be noted by specific citations to the record.

them.  DNA evidence linked Matamoros to the crime.

The jury found Matamoros guilty of capital murder for murdering Goebel during the course of committing or attempting to commit burglary of a habitation and during the course of committing or attempting to commit robbery.

During the penalty phase of Matamoros's trial, the State presented evidence that Matamoros was previously incarcerated in the Harris County jail.  42 Tr. at 17-27.[2]  William Lee Huntington, a fellow jail inmate, testified that Matamoros punctured Huntington's eardrum during a fight.  *Id.* at 29-33.  Another inmate testified that he saw Matamoros receive contraband from a visitor while the other inmate was visiting with his fiancee.  Matamoros threatened the inmate and the inmate's fiancee with death if either one of them told anyone about what they saw.  *Id.* at 39-44.

Law enforcement officers testified concerning incidents in which Matamoros was belligerent or uncooperative.  In one incident, he head butted a police officer.  *Id.* at 61-87.

The mother of Matamoros's common law wife opined that Matamoros has a bad character and bad reputation.  *Id.* at 96.  Matamoros's daughter testified that she and her siblings lived with their grandmother and that Matamoros rarely visited.  On the one occasion that Matamoros's children stayed at Matamoros's home, Matamoros sexually assaulted his daughters.  *Id.* at 131-48. A Houston police officer testified that he had several run-ins with Matamoros, including one incident in which Matamoros stole a clipboard from a police car and then resisted arrest.  After Matamoros's arrest for sexually abusing his daughters, Matamoros spat at and attempted to kick an officer.  The officer characterized Matamoros as violent and having no respect for the law.  *Id.* at

---

[2]        "Tr." refers to the transcript of Matamoros's trial.

156-62.

Matamoros also threatened the witness who told the police officer about the clipboard theft. He later broke into her house, urinated on her and tried to sexually assault her in the presence of her four year old daughter.  He also tried to assault the daughter.  When the witness tried to call 911, Matamoros pulled her phone out of the wall.  The witness was seven months pregnant at the time of the attack.  *Id.* at 181-95.

Matamoros testified on his own behalf during the penalty phase.  He denied killing Goebel and claimed that a man named Danny Castillo was the real killer.  He testified that he informed his counsel about Castillo only on the morning of his testimony because he feared reprisals from his gang, The Mexican Mafia.  Matamoros claimed that Castillo told him he was going to kill Goebel for "messing over with his wife."  43 Tr. at 227-42.  On cross examination, Matamoros admitted that he would do "anything" for his gang and that he had, in fact, beaten people up for no reason other than being ordered to do so by gang superiors.  He denied that he would kill on gang orders, however. *Id.* at 242-53.  The State also presented evidence of several extraneous offenses, including two auto thefts, the theft of the clipboard from the police car, assaulting a police officer, resisting arrest, assaulting and threatening a witness, and sexually assaulting his children.  *Id.* at 274-82.  An expert testified as a rebuttal witness that Danny Castillo's fingerprints were not recovered from the crime scene.  44 Tr. at 338-41.

The jury found that Matamoros caused Goebel's death deliberately and with the reasonable expectation that his conduct would result in Goebel's death, and that there is a probability that Matamoros will commit future criminal acts of violence constituting a continuing threat to society. 45 Tr. at 43-44.  Accordingly, the trial court sentenced Matamoros to death.  46 Tr. at 3-4.

4

The Texas Court of Criminal Appeals affirmed Matamoros's conviction and sentence, *Matamoros v. State*, 901 S.W.2d 470 (Tex.Crim.App. 1995), and denied his initial state application for habeas corpus relief, *Ex Parte Matamoros*, No. 50,791-01 (Tex.Crim.App. Dec. 5, 2001). Matamoros filed his initial federal petition on July 5, 2002, and amended the petition on February 28, 2003. On July 10, 2003, Matamoros filed a second amended petition and a motion to stay the proceedings so that he could return to state court to exhaust a claim that he is ineligible for the death penalty because he is mentally retarded. On August 27, 2003, this Court granted Matamoros's motion and stayed the proceedings.

Matamoros filed a successive state petition on June 17, 2003. The Texas Court of Criminal Appeals denied this petition on June 13, 2007, and Matamoros filed his current federal petition on July 10, 2007. On April 16, 2009, Respondent moved for summary judgment.

II.   Discussion

A.   The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which became effective April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997). Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001). Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104 (2003). The solitary inquiry for a

federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254 (d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998).

B.     The Standard for Summary Judgment in Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000). Insofar as they are consistent with established habeas practice and procedure, the Federal Rules of Civil Procedure apply to habeas cases. *See* Rule 11 of the Rules Governing Section 2254 Cases. In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255

7

(1986) (The "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"). However, where a state prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981); *Foster v. Johnson*, 293 F.3d 766, 777 (5th Cir.), *cert. denied sub nom Foster v. Epps*, 537 U.S. 1054 (2002); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001); *Emery v. Johnson*, 940 F.Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997), *cert. denied*, 525 U.S. 969 (1998).  Consequently, where facts have been determined by the Texas state courts, this Court is bound by such findings unless Matamoros shows that an exception to 28 U.S.C. § 2254 applies.

C.    Summary Judgment in the Instant Case

Matamoros asserts that he is ineligible for the death penalty because he is mentally retarded, that the jury instructions during the sentencing phase were unconstitutional, that he received ineffective assistance of counsel, and that the Texas capital sentencing scheme is unconstitutional. These claims are addressed in turn.

1.    Statute Of Limitations

Thaler's summary judgment motion argues that most of Matamoros's claims are barred by the AEDPA's one-year statute of limitations.  On May 18, 2009, however, Thaler filed an advisory withdrawing the statute of limitations defense.  Accordingly, this argument is not addressed.

8

2.     Mental Retardation

In his first claim for relief, Matamoros contends that the Constitution bars his execution because he is mentally retarded.  While the Supreme Court, in *Atkins v. Virginia,* 536 U.S. 304 (2002), held that a state may not execute a mentally retarded offender, the court did not adopt a particular definition of mental retardation.

The Texas legislature has yet to adopt a definition of mental retardation for *Atkins* purposes. The Texas Court of Criminal Appeals has stepped into the breach and articulated standards by which to evaluate *Atkins* claims, opting for a blend of the AAMR and APA standards and the standards of Texas's Persons With Mental Retardation Act, TEX. HEALTH & SAFETY CODE ANN., § 591.003(13). *See Ex parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004).  These standards are in substantial agreement that a diagnosis of mental retardation requires:  (1) significantly sub-average intellectual functioning; (2) deficits in adaptive functioning; and (3) onset before age 18.[3]

a.     State Court Findings

1.     Intellectual Functioning

The state trial court found that Matamoros did not have significantly subaverage intellectual functioning, but the TCCA rejected that conclusion.  Therefore, the state habeas court ultimately found in Matamoros's favor on this prong.

2.     Adaptive Behavior

The state habeas court adopted the 10 adaptive behavior skill areas listed in the 1992

---

[3]     The Supreme Court cited this definition with approval in *Atkins*, 536 U.S. at 309 n.3.

American Association of Mental Retardation ("AAMR") diagnostic manual and the DSM-IV.  These are:  communication, self-care, home living, self-direction, social/interpersonal, use of community resources, functional academics, work, leisure, and health and safety.  The court cited that AAMR definition for deficits in adaptive behavior:  That a deficit exists when an individual has significant limitations in at least two of the 10 areas, or when an individual's composite score from an adaptive behavior instrument is 70 or below.  The court also found that the 2002 AAMR manual proposes, but does not require, that three domains be evaluated for adaptive behavior, that each of the three consists of several skill areas and/or traits, that no tests exist to measure nine of the 16 areas listed in the three domains even though the AAMR manul states that, for diagnostic purposes, significant limitations should be established through standardized measures normed on the general population, and that the lack of such standardized instruments renders the domains incompatible with establishing limitations through the use of standardized measures.

The court found that existing adaptive behavior instruments often understate the functional competency of *Atkins* claimants because they are normed to the general population of the United States and that criminals often reject some of the adaptive behaviors embraced by the general population, such as work skills.  The court also noted that many *Atkins* claimants are not from educational, cultural and financial backgrounds that produce adaptive behavior skills.  Certain maladaptive behaviors that interfere with performance of adaptive tasks, such as temper tantrums, fighting, non-compliance, and criminal activity, do not meet the criterion of significant limitations in adaptive functioning.  SH. at 447.

A.)     Behavior At Trial

10

Based on an affidavit by Matamoros's trial counsel, the court found that Matamoros could effectively communicate with counsel before and during his trial.  Counsel could discuss the facts of the case, the applicable law, and Matamoros appeared to clearly understand what was happening and the questions asked by counsel.  The habeas court also found that Matamoros told counsel that he did not want his family members subjected to cross-examination during the penalty phase, that he understood that, in doing so, he was waiving his right to claim that counsel was ineffective for not calling these witnesses, and that the trial court found that he understood these things and that his decision was voluntary.  Based on Matamoros's testimony during trial and during hearings held outside the jury's presence, the habeas court found that Matamoros understood the questions asked of him, and could devise a story to explain why his DNA was found in the victim's house while still asserting his innocence.  The court also found that Matamoros gave a rational, if untruthful, explanation of why he waited until the penalty phase of trial to name the "real" killer, and could concoct a story to explain the cut he received during the stabbing of the victim.  *Id.* at 449-50.

### B.)   Texas Youth Commission Records

The habeas court found that Matamoros's TYC records and juvenile records showed that he began stealing cars when he was 11 or 12 years old.  His experience with juvenile probation only reinforced his dislike of the establishment and his belief that nothing would be done to him because he was a juvenile.  The court found that Matamoros's truancy reflected his attitude toward school. He dropped out of school in eighth grade, ran away from home, escaped from the custody of the Galveston County Juvenile Center in April, 1978, and was sent to TYC in June, 1978.  A diagnostic evaluation written by a caseworker that month concluded that Matamoros was immature, could not accept responsibility for his behavior, and appeared to have no insight.

Matamoros's TYC records show that he fought, and did not do his schoolwork or follow rules.  An August, 1978 report states that Matamoros was polite to staff, was taking a welding class, and accused others easily.  A report about two months later states that Matamoros played in the dorm, did not get along with other students but had greatly improved, and was doing his work and passing his classes.  A report from November, 1978 states that Matamoros aggravated other students but got along with most of them, sniffed lighter fluid, did his work in the dorm, was very immature, and was barely passing his classes.  He said he would do better when confronted, but did not work very hard to improve.  A December, 1978 report notes that he was doing better in daily living, was getting along with other students, was doing better academically and was capable of even better academic performance, and worked well in class, but did not like being confronted and made excuses for his behavior.  Matamoros's January 1979 TYC Individualized Program Plan notes that Matamoros was very proficient at daily living skills, kept himself neat and clean, was very conscientious about his personal appearance, was polite, and got along well with the staff and most of the students.

Matamoros was released from TYC in January 1979 to live with his mother, but was readmitted about a year later.  A TYC social summary prepared in January, 1980 states that Matamoros was enthusiastic and cooperative and mixed well, but described him as manipulative, aggressive, and assertive.  The summary concluded that Matamoros had good leadership potential. The summary noted that Matamoros "is very sophisticated in his dealing with delinquency activities, needs structure of state school and security of home environment."

A March, 1980 TYC summary notes that Matamoros had some potential to become a good leader, was assertive if challenged, had good social skills, might need a long-term stay at

12

Brownwood State School, and required constant supervision because he intimidated and threatened other students, bragged about killing a police officer, and was a potential security risk. Reports in the Spring of 1980 noted that Matamoros lied a lot.

The court found that TYC administered a standardized test to assess Matamoros's adaptive skills in 97 areas in January and September 1980. Matamoros could perform 60 of the 97 skills in January, and 87 of 97 in September. The court concluded that this progress shows that Matamoros has the capacity to learn and was performing fairly normally in adaptive skills. The court also noted that some of the skills such as wearing a seat belt, are, by choice, not performed in criminal culture. The court concluded that Matamoros is capable of exhibiting proper behavior and adaptive skills, that his behavior and adaptive skills improved greatly while he was at TYC, that his manipulative behavior shows understanding and social skills, that his maladaptive behavior coexisted with adequate adaptive behavior, and that Matamoros sometimes chose to disobey, as opposed to not understanding, the rules. *Id.* at 450-53.

### C.)   <u>Family Testimony</u>

Matamoros's sisters, Terri Uribe and Sandy Matamoros, testified at his state writ hearing that Matamoros urinated on himself when he was 13 or 14 years old, that their mother had to help him dress when he was that age, that their mother had to take him to the bathroom and clean him when he was six or seven years old, and had to stand near the bathroom to make sure Matamoros cleaned himself when he was 14 or 15 years old. They further testified that Matamoros could not use a toothbrush, could not follow directions, put his shoes on the wrong feet, had trouble reading, writing, and counting, and did not want to go to school because other students teased him. They also testified that their understanding of the purpose of the hearing was to get Matamoros released from

13

death row.  Based on Matamoros's TYC records, the court found the sisters' testimony unpersuasive, biased and, in parts, not credible.  *Id.* at 453-55.

D.)   <u>Independent Living</u>

Matamoros lived on his own and did construction work for about two months after running away from the Galveston County Juvenile Center.  He later worked part time with his uncle doing maintenance at an apartment complex.  The state habeas court found that Matamoros was not incarcerated for only about three years, and he chose criminal behavior over work during that time. The court found that Matamoros's inability to fill out a job application must be considered in conjunction with his academic problems.  *Id.* at 455.

E.)   <u>Death Row</u>

The State conducted an inventory of Matamoros's death row cell in connection with his state writ application.  The inventory found newspaper clippings about problems at the Houston Police Department Crime Lab; the TCCA opinion in Matamoros's case with handwritten annotations; a book about Cochise with a bookmark in it; a library book called *Time Tables of History* that Matamoros checked out of the prison library; handwritten excerpts of texts; a Spanish/English dictionary; drawings and art supplies; handwritten notes on a legal pad with grammar questions and exercises about demonstrative pronouns, descriptive adjectives, and single and plural; magazines; an inmate request form; a chess set with Matamoros's name on it; a chess board with each square marked with a letter and number; and several pieces of paper with what appeared to be chess moves written on them, such as "pawn to D5."  Testimony established that death row inmates play chess by calling out moves to each other.  Correctional Officers testified that they have seen a chess board set up in Matamoros's cell, but have never seen him playing chess.  The inventory also found Ramen

14

noodles, a fan, a radio, a hotpot, and earphones for the radio; an inmate request for special purchase, and a list of items purchased at the commissary, and commissary order slips containing a handwritten list of items purchased and their price, signed by Matamoros. Some of the slips contained corrections made by Matamoros. *Id.* at 455-57.

Testimony by TDCJ personnel established that Matamoros showers regularly, shaves, brushes his teeth, and keeps himself clean and neat. He talks to other inmates through bars. He chooses to go to recreation, where he does sit-ups and pushups. He draws cartoons and pictures of Indians. Matamoros responds to questions appropriately and logically, does not appear to have trouble understanding others, and understands orders given to him.

Matamoros fills out inmate visitation forms with the names, relationships, addresses, and phone numbers of the people he wants to visit him. Matamoros saw visitors and regularly made changes to his visitation lists by filling out a standard form. On May 1, 1997, Matamoros removed all the names on his visitor list and replaced them with new names.

Testimony also established that Matamoros filed at least one grievance, complaining that he and another Hispanic inmate were treated differently than Caucasian inmates. Matamoros was written up for stabbing another inmate with a homemade knife, and several times for having marijuana, usually procured by bribing a guard and arranging for someone on the outside to pay the bribe.

Based on these findings, and evidence of his membership in the Mexican Mafia, the state court found that Matamoros demonstrates functionality in the adaptive behavior skills of self-care, social/interpersonal, use of community resources, home living, functional academics, health and safety, communications, self-direction, leisure, and planning. *Id.* at 457-60.

15

F.)     Testing By Expert Witnesses

Dr. Susanna Rosin, Matamoros's retained expert, administered the Vineland Adaptive Behavior Scale.  The court discounted her results, finding that she relied on records and self-reporting by Matamoros rather than information supplied by people close to Matamoros, and that there are no norms for using the Vineland in this manner.  The court also found that the score Dr. Rosin assigned to Matamoros in communication skills was so low that it is descriptive of a person who cannot carry on a conversation, be questioned or cross-examined, and can respond only to basic questions.  The composite score assigned by Rosin is descriptive of a person requiring ongoing supervision.  The court found these scores incompatible with the abilities Matamoros demonstrated during his trial testimony and those documents in his TYC and TDCJ records.  The composite score of 41 is also incompatible with the Full Scale IQ score of 65 reported by Dr. Rosin on the WAIS-III, a test of general intelligence.  *Id.* at 462-63.

The state habeas court noted that the State's expert, Dr. George Denkowski, administered the ABAS to Matamoros in 2005.  The ABAS is a standardized instrument for measuring adaptive behavior.  The court found that a valid scaled score of 4 or less on the ABAS indicates deficits in the relevant area of adaptive behavior.  The AAMR states that deficits exist when an individual has deficits in two or more of the 10 areas of adaptive behavior.  A composite score can be obtained by adding the scaled scores in the 10 areas, and a valid composite score of 70 or less, with a 3 point margin of error, indicates significant deficits in adaptive behavior at the 95 percent confidence level.

Matamoros attained a score of 8 in communication, 5 in home living, 6 in work, and 5 in use of community resources.  Denkowski believed the score for use of community resources was understated based on Matamoros's ability to use community resources by stealing.  Matamoros also

attained a score of 5 in self-care, but Denkowski adjusted that to 6 based on Matamoros's self-reported information that he bit his fingernails to trim them, rather than cutting and filing them as listed on the ABAS.

Matamoros attained a 3 on social/interpersonal, which Denkowski adjusted to a 4 based on Matamoros's ability to manipulate others and to use appropriate social skills when he chose to do so.  Matamoros scored a 3 in self-direction.  The court noted that this score would mean that Matamoros was aimless and would not do anything on his own initiative.  Based on Matamoros's self-reported system and plan for stealing cars and his documented ability to formulate and carry out criminal plans, the court found that this score was not an accurate representation of Matamoros's self-direction.

Denkowski adjusted Matamoros's score of 4 on leisure to a 5 based on his membership in the Mexican Mafia, and that he cooked for his family, went to basketball games with his family, and listened to the news.  The court found that Matamoros's attained score of 4 in the area of health and safety was not an accurate representation of his actual ability based on his documented decision to hurt another person for the Mexican Mafia while declining to kill someone for the Mexican Mafia. This, the court found, shows that Matamoros can conduct himself in a safe manner if he so chooses.

Denkowski testified that the ABAS results showed that Matamoros has deficits in functional academics, though Denkowski thought Matamoros had the potential for better performance if he applied himself.  The state habeas court found that the ABAS scores showed no deficit in the areas of communication, home living, work, use of community resources, and self-care.  The court also found that Matamoros's scores in the areas of leisure, social/interpersonal, self-direction, and health and safety did not accurately reflect his abilities in those areas and, thus, did not show deficits in

17

adaptive behavior.  The court therefore found a deficit in only one area, functional academics.  The

court further found that Matamoros's composite score of 63, adjusted by Denkowski to 65, did not

accurately reflect Matamoros's actual functioning.  *Id.* at 463-67.

   G.) *Briseno* Factors

   Applying the factors laid out in *Ex Parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004),

the court found that Matamoros was neither considered nor treated as mentally retarded during his

time in the custody of the TYC, and that the testimony of Matamoros's sisters was not credible.

Based on his criminal history, the court found that Matamoros formulated and carried out plans.  His

criminal history, potential for leadership displayed at TYC, and membership in the Mexican Mafia

showed Matamoros's capacity for leadership.

   Matamoros's juvenile offenses, lying to his mother about where he got stolen cars,

manipulative behavior at TYC, commission of the capital murder and behavior after the offense, and

his attempt to blame someone else for the capital murder demonstrated rational and appropriate

conduct.   His communications with trial counsel, colloquy with the trial court, testimony,

communications in prison, and interview with Denkowski show that Matamoros can respond

coherently and rationally to questions.  Citing numerous examples of Matamoros being untruthful,

the court found that Matamoros can hide facts and effectively lie in his own interest.  Finally, the

court found that Matamoros's commission of the capital murder required planning, forethought, and

complex execution.  Based on all this information, the court concluded that Matamoros fails to show

deficits in adaptive behavior.  Because the court found that Matamoros failed to show that he has

significant deficits in adaptive functioning, it also found that no such deficits originated during

Matamoros's developmental period.  Therefore, the court found that Matamoros failed to show by a preponderance of the evidence that he is mentally retarded.  *Id.* at 467-69.

The state habeas court found that Matamoros did not show by a preponderance of the evidence that he has significantly subaverage intellectual functioning.  In the alternative, the court found that, even if Matamoros does have significantly subaverage intellectual functioning, he is not mentally retarded because he has adequate adaptive behavior skills.  Because the court found that he has neither significantly subaverage intellectual functioning, nor deficits in adaptive behavior, it also found that there was no onset before age 18.  *Id.* at 469-72.

The TCCA rejected the trial court's finding that Matamoros failed to show that he has significantly sub-average intellectual functioning, but agreed with the trial court that he failed to demonstrate that he has significant limitations in adaptive functioning.  *Ex Parte Matamoros*, No. 50,791-02, slip op. at 2-3 (Tex.Crim.App. June 13, 2007).   Therefore, the TCCA concluded that Matamoros is not mentally retarded.  *Id.* at 3.

      b.    <u>Analysis</u>

.   The American Association on Mental Retardation ("AAMR") defines mental retardation as (1) sub-average general intellectual functioning; (2) related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work; and (3) onset before the age of 18. R. Luckasson, et al., *Mental Retardation: Definition, Classification, and Systems of Supports* (9th ed. 1992).  While the Supreme Court, in *Atkins,* held that a state may not execute a

mentally retarded offender, the court did not adopt a particular definition of mental retardation.

1.     The Texas State Court Standard

Matamoros now argues that the state habeas court failed to note changes to the AAMR standard published in 2002. He contends that, because the state court used the older version of the AAMR standard, it unreasonably determined the facts to conclude that Matamoros is not mentally retarded. This argument is foreclosed by controlling precedent.

The Fifth Circuit has noted that *Atkins* does not mandate that a state adopt any particular clinical definition.

> Although the [*Atkins]* Court did refer to the clinical definitions of mental retardation promulgated by the AAMR and the [American Psychological Association], it did not dictate that the approach and analysis of the State *must* track the AAMR or the APA exactly.

*Clark v. Quarterman*, 457 F.3d 441, 445 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 1373 (2007). Therefore, Matamoros's argument that the state court's conclusion was unreasonable because it relied on the older AAMR standard – *i.e.*, did not "track the [current] AAMR [standard] exactly" – fails.

2.     Mental retardation

The Texas legislature has yet to adopt a definition of mental retardation for *Atkins* purposes. The Texas Court of Criminal Appeals has stepped into the breach and articulated standards by which to evaluate *Atkins* claims, opting for a blend of the AAMR and APA standards and the standards of Texas's Persons With Mental Retardation Act, TEX. HEALTH & SAFETY CODE ANN., § 591.003(13). *See Ex parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004). These standards are in substantial

agreement that a diagnosis of mental retardation requires:  (1) significantly sub-average intellectual

functioning; (2) deficits in adaptive functioning; and (3) onset before age 18.

A.)      Intellectual Functioning

As noted above, the state trial court found that Matamoros failed to prove that he has

significantly sub-average intellectual functioning, but the TCCA rejected that finding.  Therefore,

the state habeas finding on this issue is that Matamoros has proven this element of mental

retardation.

B.)      Adaptive Functioning

The state habeas court found that:

> Based on the unreliability of using traditional adaptive behavior
> scales on the adult, criminal applicant, based on [Matamoros]'s
> possession of skills for which traditional adaptive behavior
> [instruments] do not credit, based on [Matamoros]'s records at TYC
> and TDCJ-CID, and based on [Matamoros]'s demonstrated abilities
> to care for himself, to carry out plans, to respond rationally and
> appropriately to external stimuli (albeit in a socially unacceptable
> manner), to respond coherently, rationally, and on point to questions,
> to lead and manipulate others, to lie for his own interests, and to
> commit a capital murder that required forethought, planning, and
> purpose, [Matamoros] fails to show by a preponderance of the
> evidence that he has deficits in adaptive behavior.

2SH at 471.

The habeas court found that Matamoros was able to communicate with his trial counsel and

assist in his own defense.  Matamoros communicated with the court, testified coherently in his own

defense, and manufactured a rational story explaining evidence linking him to the murder.  *Id.* at

448-50 (Findings 75-83).

21

The state habeas court also noted Matamoros's TYC records.  A social history report prepared by Fort Bend County Juvenile Probation showed that Matamoros displayed criminal behavior and a dislike of the establishment.  He believed that he could commit criminal acts and nothing would be done to him because he was a juvenile.  He was truant from school.

Matamoros withdrew from the eighth grade because of truancy and ran away from both home and the Galveston County Juvenile Center.  As a result, he was committed to the TYC in June 1978.

A June 29, 1978 caseworker's diagnostic evaluation and recommendation noted that Matamoros was immature, could not accept responsibility, and lacked insight.

A July 20, 1978 TYC report noted that Matamoros was fighting, not doing his schoolwork or following rules, and accused others easily.  However, it also noted that he was polite to staff, was taking a welding class, played in the dorm, did not get along with others but had improved, was doing work, and was passing classes.

A November 9, 1978 TYC report noted that Matamoros aggravated some other students but got along with most of them, sniffed lighter fluid, did his work in the dorm, was very immature, was barely passing in class, and would say he would do better when confronted but did not work very hard at it.

A December 7, 1978 TYC report notes that Matamoros was doing better at daily living, got along better with other students, was doing better academically and was capable of doing even better, worked well in class but did not like being confronted, and made excuses for his behavior.

A January 5, 1979 TYC report notes that Matamoros was very proficient at daily living skills, kept himself neat and clean, was very conscientious about his personal appearance, was polite,

and got along well with the staff and most of the students.

A January 21, 1980 TYC social summary notes that Matamoros was enthusiastic and cooperative, mixed well with others but was considered a manipulator, was very aggressive and assertive, and had the potential for good leadership.  The report also noted that Matamoros was very sophisticated in his dealing with delinquency activities and needed the structure of state school and security of a home environment.

A January 31, 1980 Individualized Program Plan notes that Matamoros was proficient at daily living skills, was very conscientious about his personal appearance and kept himself neat and clean, was polite and got along well with the staff and most of the students, had the ability to perform the duties for which he was responsible but had to be reminded sometimes, and was not a problem in welding class.

A March 3, 1980 TYC summary noted that Matamoros had some potential to become a good leader; he was assertive if challenged; he had good social skills; and he required constant supervision as he intimidated and threatened other students, bragged about killing a police officer, and was a potential security risk.

A May 1980 TYC report indicates that Matamoros appeared positive but it was considered a front; he needed a lot of help with his lying problem but had no desire to change; lying made it difficult to care for him.

A June 1980 TYC record notes that Matamoros was very negative, constantly lied, tried to manipulate the staff and his peers, resented all authority, and he did not hold himself or his group members accountable.  *Id.* at 450-52 (Findings 84-96).

The court also noted that Matamoros lived alone and did construction work for about two months after running away.  The court stated that Matamoros's lack of employment during the time he was not incarcerated should be considered in conjunction with Matamoros's academic problems and the fact that he chose to engage in criminal behavior for a living.  The court dismissed the testimony of Matamoros's sisters, describing Matamoros as severely disabled, as not credible in light of the extensive record from TYC showing Matamoros's abilities. *Id.* at 453-54 (Findings 100-105).

The court observed that a search of Matamoros's death row cell found newspaper clippings about the Houston Police Department Crime Lab, the TCCA opinion in Matamoros's case with notes and underlining, a book about the American Indian leader Cochise with a bookmark in it, a book titled *Time Tables of History*, which was checked out of the prison library, a Spanish/English dictionary, drawings and art supplies, handwritten notations on a legal pad with grammatical exercises, magazines, an inmate request form, commissary slips, and a chess set with grid and pieces of paper indicating chess moves on them. *Id.* at 456-57 (Findings 107-15).

Evidence also showed that Matamoros adequately cared for his own health and hygiene while on death row.  He showered, shaved, brushed his teeth, kept himself clean and neat, and exercised by doing sit-ups and push-ups.  He talked to other inmates, answered questions appropriately and logically, and appeared to understand others and understand orders given to him by TDCJ staff. *Id.* at 458 (Findings 116-17).

The state court discounted Dr. Susanna Rosin's opinion based on her administration of the Vineland Adaptive Behavior Scale.  The court found that Dr. Rosin did not administer the test

properly, relying on Matamoros's self-reporting rather than asking someone close to Matamoros to answer the questions.  The court also noted that Dr. Rosin's results indicated a person with borderline severe mental retardation, which was inconsistent with Matamoros's behavior in court and his other documented behavior.  The court also found that some of Matamoros's antisocial behaviors would not be credited on an adaptive skills test.  Based on these observations, the court was unpersuaded by Dr. Rosin's testimony.  *Id.* at 461-63 (Findings 126-35).

Dr. George Denkowski evaluated Matamoros on behalf of the State.  The state court found that Denkowski administered the ABAS, requiring Matamoros to rate himself on 239 skills encompassed by the 10 areas of adaptive behavior recognized by the AAMR.  A composite score of 70 or less indicates deficits in adaptive behavior.  Self-ratings should be verified by other means. The court also found that the ABAS and similar instruments tend to understate the abilities of *Atkins* claimants.

Matamoros's scores on the ABAS did not show deficits in the areas of communication, home living, work, use of community resources, or self-care.  The court found that Matamoros's scores in leisure, social/interpersonal, self-direction, and health/safety were understated.  The court found that Matamoros has a deficit in functional academics.  Denkowski concluded that Matamoros did not have significant deficits in adaptive behavior and is, therefore, not mentally retarded.  *Id.* at 463-66 (Findings 136-50).

The court also evaluated Matamoros's adaptive functioning under the factors set out by the TCCA in *Briseno*.  These factors include:  (1) whether those who knew him during his developmental period considered him mentally retarded; (2) whether he has formulated and carried

25

out plans; (3) whether his conduct shows that he is a leader; (4) whether his conduct in response to external stimuli is rational and appropriate, whether or not it is socially acceptable; (5) whether he responds coherently and rationally to questions; (6) whether he can effectively lie to further his own or others' interests; and (7) whether the crime for which he was convicted required planning and complex execution.  The court evaluated Matamoros under each of these factors based on the record and Matamoros's behavior in court and concluded that Matamoros does not have deficits in adaptive functioning.  *Id.* at 467-69 (Findings 151-58).

Matamoros cites a psychological report prepared in 1977 for Fort Bend County Juvenile Probation.  This report estimates Matamoros's full scale IQ at 71, notes significant difficulties in reading, spelling, arithmetic, and language-based behaviors, referred to him as "somewhat socially inept, direct and simplistic in his dealings with others . . . highly group-dependent, and

. . . very easily led . . . [He] depends highly upon individuals in his group to provide him with leadership, and to support him in problem-solving behavior."  Matamoros also cites a diagnostic exam administered by a caseworker in 1978 noting that Matamoros had problems categorizing teeth, hair, or clothes as clean or dirty, could not identify helpful people or things, or weigh risks against benefits in evaluating actions, lacked interpersonal skills, and could not carry out simple verbal instructions.  Matamoros cites other test results showing that he had significant academic problems.  Matamoros also criticizes Dr. Denkowski's methodology and conclusions.

Even if Denkowski's opinion is disregarded, however, the state court's conclusion was reasonable.  The 1977 diagnosis of mild mental retardation does not specifically address the subject of deficits in adaptive behavior.  While such a finding may be implicit in the diagnosis, there is

26

ample evidence in the record to contradict any such finding.  Significantly, records from later in Matamoros's stay at TYC show that Matamoros learned and grew in his abilities.  This suggests that the problems in adaptive behavior reflected in the earlier diagnosis and evaluations were not the result of mental retardation, but of Matamoros never having learned these adaptive behaviors or having chosen not to engage in them.  Similarly, the notes by caseworkers and others cited by Matamoros for the proposition that he was socially inept, easily led, etc. are undermined by later entries into Matamoros's record by TYC staff documenting growth by Matamoros in many of these areas and noting, in particular, that Matamoros showed good potential for leadership.

The two areas which are not strongly undercut are Matamoros's borderline IQ, and his academic problems.  The TCCA, however, found that Matamoros meets the intelligence criterion for mental retardation.  The state habeas court also found that Matamoros has a significant deficit in the adaptive area of academic functioning.  Therefore, this evidence does not demonstrate that the state court findings were unreasonable; on the contrary, it supports the state court findings on these issues.  It is the evidence showing that Matamoros does not have significant deficits in other areas of adaptive behavior that is fatal to Matamoros's claim.  Because the state court's conclusion that Matamoros does not suffer from significant deficits in two or more areas of adaptive functioning is reasonable based on the evidentiary record, it is entitled to deference under the AEDPA, and Matamoros is not entitled to relief on this claim.

      3.    <u>Jury Instructions</u>

In his second claim for relief, Matamoros contends that the jury instructions violated the rule set out by the Supreme Court in its *Penry* line of cases.  In *Penry v. Johnson*, 532 U.S. 782 (2001),

27

the Supreme Court clarified that a capital sentencing jury must "be able to consider and *give effect to* a defendant's mitigating evidence in imposing sentence." *Id.* at 797 (internal quotation marks, citation and brackets omitted).  Matamoros argues that his testimony that he did not want his mother, sister, or children called to testify showed that he did not want his family put through the trauma of testifying, demonstrating that he has the capacity for compassion toward others.  Matamoros also notes that the State presented evidence that Matamoros was considered a suicide risk by jail officials on two prior occasions, dating to four years before his capital murder trial.  He also notes evidence that he was disciplined while incarcerated for being non-responsive to orders.  Matamoros contends that the jury could have inferred from this evidence that he suffered from mental illness or emotional instability.

In Penry's trial, the jury was told to determine whether the evidence supported a finding on any of three statutory special issues.  It was then told that it must consider mitigating evidence and, if it concluded that the weight of the mitigating evidence dictated in favor of a life sentence, it should answer "no" to one of the special issues.  *Id.* at 789-90.

The Supreme Court found that there were two plausible interpretations of the instructions given to Penry's jury.  First, it could be understood as instructing the jurors to weigh the mitigating evidence in determining its answer to each special issue.  *Id.* at 798.  The Court held, however, that none of the special issues was broad enough for the jury to give mitigating effect to the evidence of Penry's mental retardation and the abuse he suffered as a child.  *Id.*  For example, the jury could fully credit the mitigating evidence, believe it required a sentence less than death, but find that Penry's mental retardation actually made him *more dangerous* in the future, thereby compelling a

28

positive answer to the future dangerousness special issue.  The Court found that a second plausible

interpretation was that the jury could simply nullify, *i.e.*, give a negative answer to a special issue

which it actually found was supported by the evidence.  *Id.*  The Court found that this interpretation

made the jury instructions "internally contradictory, and placed law-abiding jurors in an impossible

situation."  *Id.*  The Court therefore concluded that the instructions injected an unacceptable element

of capriciousness into the sentencing decision.  *Id.* at 800.

At Matamoros's trial, the court instructed Matamoros's jury to consider all mitigating

evidence presented at either phase of the trial.  RA at 446.[4]  The trial court went on, however, to

instruct the jury:

> If you determine, when giving effect to the mitigating evidence, if
> any, that a life sentence, as reflected by a negative finding to the issue
> under consideration, rather than a death sentence, is an appropriate
> response to the personal culpability of the defendant, a negative
> finding should be given to that special issue under consideration.

*Id.* at 446-47.  This plainly violates the *Penry* rule.

In his state habeas application, Matamoros noted the evidence that he did not want his family

to testify and claimed evidence that he suffered a traumatic childhood and had positive character

traits.  He only argued, however, that this violated his rights under *Penry I*, which held that the

Texas special issues violate the Fourteenth Amendment because they do not allow a capital

sentencing jury to give full consideration and effect to mitigating evidence.  *Penry v. Lynaugh*, 492

U.S. 302 (1989).  The state habeas court denied relief, finding that the fact that he did not want his

family to testify was not evidence of compassion and that there was a lack of evidence of a traumatic

---

[4]   "RA" refers to the record on Matamoros's direct appeal.

childhood.  SH at 19-20 (Conclusions of Law a 1 and 3).  Alternatively, the court found that the jury

could fully consider such evidence within the scope of the special issues.  *Id.* at 2 and 4.

In this federal petition, Matamoros argues for the first time that the instructions violated

*Penry II*, *see Penry v. Johnson*, 532 U.S. 782 (2001), discussed above, holding that the nullification

instruction was an inadequate remedy to the constitutional defect that was the basis of *Penry I*.  He

also cites for the first time the jail cards identifying him as a suicide risk, and the evidence that he

contends supports his claim of emotional instability.

AEDPA requires that a prisoner exhaust his available State remedies before raising a claim

in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a state court shall not be granted
> unless it appears that (A) the applicant has exhausted the remedies
> available in the courts of the State; or (B)(I) there is an absence of
> available State corrective process; or (ii) circumstances exist that
> render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  As the Fifth Circuit explained in a pre-AEDPA case, "federal courts must

respect the autonomy of state courts by requiring that petitioners advance in state court all grounds

for relief, as well as factual allegations supporting those grounds.  "[A]bsent special circumstances,

a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court

before he may seek federal habeas relief."  *Orman v. Cain*, 228 F.3d 616, 619-20 (5th Cir. 2000);

*see* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in

custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the

applicant has exhausted the remedies available in the courts of the State

. . . .").  This rule extends to the evidence establishing the factual allegations themselves.  *Knox v. Butler*, 884 F.2d 849, 852 n.7 (5th Cir. 1989), *cert. denied*, 494 U.S. 1088 (1990) (citing 28 U.S.C. § 2254(b)); *see also Jones v. Jones*, 163 F.3d 285, 298 (5th Cir. 1998), *cert. denied*, 528 U.S. 895 (1999) (noting that "[s]ubsection (b)(1) [of AEDPA] is substantially identical to pre-AEDPA § 2254(b)").  Because Petitioner did not present this *Penry II* claim to the Texas state courts, he has failed to properly exhaust the claim, and this Court may not consider it.  *Knox*, 884 F.2d at 852 n.7.

Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims.  *Rose v. Lundy*, 455 U.S. 509 (1982).  Such a result in this case, however, would be futile because Petitioner's unexhausted claims would be procedurally barred as an abuse of the writ under Texas law.  On habeas review, a federal court may not consider a state inmate's claim if the state court based its rejection of that claim on an independent and adequate state ground.  *Martin v. Maxey*, 98 F.3d 844, 847 (5th Cir. 1996).  A procedural bar for federal habeas review also occurs if the court to which a petitioner must present his claims to satisfy the exhaustion requirement would now find the unexhausted claims procedurally barred.  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Texas prohibits successive writs challenging the same conviction except in narrow circumstances.  Tex.CodeCrim.Proc.Ann. art. 11.071 § 5(a) (Vernon Supp. 2002).  The Texas Court of Criminal Appeals will not consider the merits or grant relief on a subsequent habeas application unless the application contains sufficient specific facts establishing the following:

> (1) the current claims have not been and could not have been presented previously in an original application or in a previously considered application because the

factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; or

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

*Id.* The Texas Court of Criminal Appeals applies its abuse of the writ doctrine regularly and strictly. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (per curiam).

Petitioner does not claim that he could not have presented the claim in his state habeas petition because the factual basis for the claim did not exist, or that he is actually innocent. Therefore, Petitioner's unexhausted claim does not fit within the exceptions to the successive writ statute and would be procedurally defaulted in the Texas courts. *Coleman*, 501 U.S. at 735 n.1. That bar precludes this Court from reviewing Petitioner's claim absent a showing of cause for the default and actual prejudice attributable to the default, or that this Court's refusal to review the claim will result in a fundamental miscarriage of justice. *Id.* at 750. Matamoros shows neither.

4.      Ineffective Assistance Of Counsel

Matamoros next contends that his trial counsel rendered ineffective assistance by failing to investigate mitigating evidence. In support of this claim, Matamoros notes that TDCJ records indicate that Matamoros was prescribed the anti-psychotic drug Thorazine in 1985. A psychologist noted at that time that Matamoros was depressed and heard voices. Pet. Exh. M. Matamoros now submits an affidavit by Dr. Seth Silverman in which Silverman opines that these observations constitute evidence of a potentially severe mental illness. Pet. Exh. L.

32

Matamoros also attaches as Exhibit N to his petition TDCJ records showing that Matamoros was diagnosed as paranoid schizophrenic in 1985.  A week after that diagnosis, a psychologist noted that Matamoros seemed less depressed and that Matamoros stated that he no longer felt suicidal after receiving his Thorazine prescription.  Matamoros also reported that he was treated for auditory hallucinations from 1979 to 1980.  Later TDCJ evaluations, however, indicated no special psychiatric needs.  On December 11, 1989, Matamoros received medical treatment for stabbing himself in the thigh while working in the prison meat packing plant.

Matamoros also notes that he has nine siblings, that his father died when he was nine years old, and that he was first sent to TDCJ when he was 12 years old.  Matamoros's brother had a mental breakdown and received mental health treatment from 1979-1981.

Matamoros states that he was previously incarcerated during a period when the TDCJ was the defendant in a civil rights lawsuit alleging systemwide brutality.  That suit resulted in a court order for the TDCJ to remedy numerous constitutional violations.  Matamoros faults his trial counsel for failing to investigate the extent to which such institutional brutality affected him, but cites no specific instances in which he was the victim of such brutality.  He also claims that he joined the Mexican Mafia prison gang "as a direct result of the fundamental constitutional violations occurring within the TDCJ during Mr. Matamoros's incarcerations."  Pet. at 61.  He again fails to cite any evidence to support this claim.

To prevail on a claim for ineffective assistance of counsel, Petitioner

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that

33

> counsel's errors were so serious as to deprive the defendant of a fair
> trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In order to prevail on the first prong of the *Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.  *Id.* at 687-88.  Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances.  *Id.* at 688.  Review of counsel's performance is deferential.  *Id.* at 689.

In the context of a claim that counsel rendered ineffective assistance by failing to investigate, the question becomes whether the decision not to investigate was, itself, reasonable.  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (internal quotation marks and alteration omitted) (quoting *Strickland*, 668 U.S. at 690-91).  When assessing the reasonableness of an attorney's investigation, a court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Id.* at 527.  To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial.  *See United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

The State notes that, while Matamoros presented an ineffective assistance of counsel claim to the state court, he did not include the evidence now submitted as Exhibits L, N, and O.  Exhibits L and N contain evidence of possible mental illness.  Exhibit O is an affidavit from Matamoros's lead trial counsel stating that counsel did not pursue evidence of mental illness because he observed

no characteristics of mental illness in Matamoros.  He also states that he reviewed Matamoros's jail records and history but determined that they would do more harm than good to Matamoros's case. Ex. O at 4.

Evidence presented for the first time in a federal habeas proceeding cannot present new factual allegations and must supplement, as opposed to fundamentally alter, claims presented to the state court.  *Morris v. Dretke*, 379 F.3d 199, 204-05 (5th Cir. 2004); *Dowthitt*, 230 F.3d at 746.  If the petitioner presents material evidentiary support for the first time in federal court, then he has not exhausted his state remedies.  *Morris*, 379 F.3d at 204-05.  Therefore, this evidence is unexhausted and may not be considered.

Even if the Court could consider this evidence, however, Matamoros's claim would fail. Evidence of mental illness is clearly double-edged.  While it might elicit sympathy or mitigate a defendant's moral culpability, it could also increase concerns about the defendant's future dangerousness.  In this case, counsel states that he reviewed Matamoros's jail records, which contain some of the evidence of mental illness Matamoros now cites.  He states that he thought such evidence would do more harm than good.  That was a reasonable strategic decision by counsel. Matamoros therefore fails to show that counsel rendered deficient performance.

Matamoros also contends that counsel failed to investigate his family background.  Affidavits from counsel, however, establish that counsel did speak to Matamoros's family and review records, but that Matamoros instructed counsel not to call his family members to testify.

Neither the Supreme Court nor the Fifth Circuit has ever held that a lawyer provides ineffective assistance by complying with the client's clear and unambiguous instructions to not

present evidence.  In fact, the Fifth Circuit has held on several occasions that a defendant cannot instruct his counsel not to present evidence at trial and then later claim that his lawyer performed deficiently by following those instructions.  In *Autry v. McKaskle*, 727 F.2d 358 (5th Cir. 1984), *cert. denied*, 465 U.S. 1085 (1984), the defendant prevented his attorney from presenting any mitigating evidence during the punishment phase of his capital trial.  The Fifth Circuit rejected Autry's claim that counsel was ineffective for heeding his instructions:  "If Autry knowingly made the choices, [his lawyer] was ethically bound to follow Autry's wishes." *Id.* at 362;[5] *see also Nixon v. Epps*, 405 F.3d 318, 325-26 (5th Cir.), *cert. denied*, 546 U.S. 1016 (2005), (finding that counsel was not ineffective for failing to present additional mitigating evidence over client's objection; "A defendant cannot block his counsel from attempting one line of defense at trial, and then on appeal assert that counsel was ineffective for failing to introduce evidence supporting that defense."); *Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004), *cert. denied*, 544 U.S. 963 (2005), (noting that defendant may not obstruct attorney's efforts, then claim ineffective assistance of counsel); *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000) (finding that counsel was not ineffective for failing to call family members during punishment phase where defendant stated that he did not want family members to testify).[6]

5.     Constitutionality Of The Texas Capital Sentencing Scheme

---

[5]     The *Autry* court also rejected the defendant's claim that counsel was required to request a competency hearing before agreeing to comply with the client's decisions. *Id.*

[6]     *Cf. Schriro v. Landrigan*, 127 S. Ct. 1933, 1940-41 (2007) (stating that, if defendant instructed counsel not to present mitigating evidence, "counsel's failure to investigate further could not have been prejudicial under *Strickland*"); *Amos v. Scott*, 61 F.3d 333, 348-49 (5th Cir. 1995) (denying ineffective assistance claim for want of prejudice where defendant "strongly opposed" presenting any witnesses during punishment phase of trial).

In his fourth claim for relief, Matamoros argues that the Texas capital sentencing scheme is unconstitutional because evidence presented in mitigation of sentence may also be seen by the jury as supporting one of the special issues.  He contends that this unconstitutionally forces defense counsel to choose between presenting potentially double-edged evidence, or not presenting mitigating evidence.  Matamoros cites as an example evidence of mental illness which, he observes, may reduce a defendant's moral culpability while also increasing the likelihood that he presents a future danger to society.

The Fifth Circuit has expressly held that "a constitutional violation does not result simply because the Texas death penalty scheme triggers certain tactical choices on the part of counsel." *Andrews v. Collins*, 21 F.3d 612, 630 (5th Cir. 1994), *cert. denied sub nom. Andrews v. Scott*, 513 U.S. 1114 (1995).  Matamoros's claim is thus foreclosed by clear precedent.

6.     Vagueness of the Special Issues

In his fifth claim for relief, Matamoros argues that the special issues function as aggravating factors and the trial court's failure to define certain terms used in the special issues rendered them unconstitutionally vague.  Specifically, he argues that the use of the word "deliberately" in the special issue asking whether he deliberately committed the acts causing the victim's death, and the word "probability" in the special issue asking whether there is a probability that Matamoros would commit future acts of criminal violence constituting a continuing threat to society, fail to channel the jury's discretion.  The Fifth Circuit has repeatedly rejected the general argument that the terms employed in the Texas capital sentencing scheme are unconstitutionally vague, and the specific argument Matamoros makes.  *See, e.g., West v. Johnson*, 92 F.3d 1385, 1406 (5th Cir. 1996), *cert.*

37

*denied*, 520 U.S. 1242 (1997), (rejecting claim that the Texas capital sentencing scheme special issues work as aggravating factors and therefore require detailed definitions of the terms employed therein); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir.), *cert. denied*, 519 U.S. 854 (1996), (rejecting argument that the terms used in the special issues are "aggravating factors" and unconstitutionally vague absent definition); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.), *cert. denied*, 509 U.S. 947 (1993), (holding that the terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society," "have a common-sense core of meaning that criminal juries should be capable of understanding") (citation omitted); *Milton v. Procunier*, 744 F.2d 1091, 1095-96 (5th Cir. 1984) ("deliberately," "probability," and "criminal acts of violence" "have a plain meaning of sufficient content that the discretion left to the jury" is "no more than that inherent in the jury system itself").   Accordingly, Matamoros is not entitled to relief on this claim.

       7.    Effect of a Single "No" Vote

In his final argument, Matamoros argues that the jury instructions misled the jury on the effect of a single "no" on one of the special issues.  Under Texas law, a single "no" vote would result in the imposition of a life sentence.  The jury was instructed only that a "no" vote by 10 or more jurors was required for the jury's answer on that special issue to be "no."  Matamoros argues that this misleads the individual jurors into thinking that they cannot return a life sentence unless at least ten jurors agree on an answer to the special issue.

Matamoros relies on *Mills v. Maryland*, 486 U.S. 367 (1988) and *McKoy v. North Carolina*, 494 U.S. 433 (1990) to support his claim.  In those cases, the Supreme Court held that capital sentencing schemes requiring the jury to unanimously find the existence of any mitigating factor

38

before giving that factor any weight violated the Eighth Amendment.  Rather, the Court held, each juror must be free to give any mitigating evidence any weight that juror deems appropriate in weighing mitigating against aggravating evidence.  *See McKoy*, 494 U.S. at 442-43.

"*Mills* is not applicable to the capital sentencing scheme in Texas.  We have concluded that '[u]nder the Texas system, all jurors can take into account any mitigating circumstance.  One juror cannot preclude the entire jury from considering a mitigating circumstance.'" *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000), (quoting *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994), *cert. denied*, 513 U.S. 1067 (1995)).

While the trial court in this case informed the jury that it could not affirmatively find that the mitigating evidence was sufficient to warrant a life sentence unless at least 10 jurors agreed, it never instructed the jury that any particular number of jurors had to agree that any particular piece of evidence was mitigating.  In other words, even if only one juror felt that a specific piece of evidence was mitigating, that juror could give the evidence any weight he deemed appropriate.  The instruction stated only that at least 10 jurors, individually weighing mitigating evidence, had to agree that there was sufficient mitigating evidence to impose a life sentence.  This instruction does not suffer from the constitutional flaw underlying *Mills* and *McKoy*.  Petitioner is not entitled to relief.

III.    Certificate of Appealability

Matamoros has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings.  *See Alexander v. Johnson*, 211 F.3d 895, 898(5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA *sua sponte*.  The statute does not require that a petitioner move for a COA; it merely states

39

that an appeal may not be taken without a certificate of appealability having been issued.") A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for COA until the district court has denied such a request.  *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").  "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000).  The Supreme Court has stated that

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "The nature of the penalty in a capital case is a 'proper consideration in determining whether to issue a [COA], but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate.'" *Washington v. Johnson*, 90 F.3d 945,

40

949 (5th Cir. 1996), *cert. denied*, 520 U.S. 1122 (1997) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)).  However, "the determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This Court has carefully considered each of Matamoros's claims.  While the issues Matamoros raises are clearly important, the Court finds that each of the claims is foreclosed by clear, binding precedent.  Therefore, Matamoros has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). This Court concludes that Matamoros is not entitled to a certificate of appealability.

IV.     <u>Order</u>

For the foregoing reasons, it is ORDERED as follows:

1.      Respondent Rick Thaler's Motion for Summary Judgment (Docket Entry 3) is

        GRANTED;

2.      Petitioner John Reyes Matamoros's Petition for Writ of Habeas Corpus (Docket Entry

        1) is in all respects DENIED, and Matamoros's Petition is DISMISSED; and

3.      No Certificate of Appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Order.

**SIGNED** this 31st day of March, 2010.


                                        _____
                                              JOHN D. RAINEY
                                        UNITED STATES DISTRICT JUDGE